UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
WINNIE GITTENS

                      Plaintiff,

    -against-

MIAN ENTERPRISES, INC., KHURSHEED HAMAN,
GILBERT HELOU, And CYNTHIA LENO,

                      Defendants.
-------------------------------------------------------------------X

Docket No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

CV 14 1797

SEYBERT, J

TOMLINSON, M

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
MAR 20 2014
LONG ISLAND OFFICE

## NATURE OF THE ACTION

1. This is a civil action brought pursuant to the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL").

2. This action seeks to recover, among other things, damages for discriminatory treatment, sexual harassment, emotional distress, interference with reinstatement, retaliation, and other legal and equitable relief pursuant to FMLA and NYSHRL.

## THE PARTIES

3. Plaintiff, Winnie Gittens, (hereinafter "Plaintiff" or "Winnie") at all times hereinafter mentioned, was and still is a resident of the County of Nassau, and the State of New York, and

1

was an employee of Checkers Restaurant, beginning as a cashier in 2003 and working her way up to a store manager by 2012.

4. Defendant Mian Enterprises, is, and at all material times, has been a domestic business corporation, duly organized and existing under and by virtue of the laws of the State of New York with its principal place of business in the County of Nassau, and the State of New York located at 2157 Roosevelt Avenue, East Meadow, New York 11554, according to their letterhead, and 2001 Grove Street, Wantagh, New York 11793, according to information on file with the Secretary of State.

5. Defendant Mian Enterprises owns and operates six Checkers Restaurant locations throughout Long Island, and is an employer as defined in 29 U.S.C. § 2611 and employs at least fifty employees for each working day during each of 20 or more calendar workweeks in the current proceeding calendar year.

6. Defendant Gilbert Helou (hereinafter "Defendant Helou"), at all relevant times, was a resident of the County of Suffolk, and the State of New York, and the general manager for all Long Island Checkers restaurant locations owned by Mian Enterprises, travelling between Checkers locations daily to monitor operations.

7. Defendant Khursheed Haman (hereinafter "Defendant Haman"), at all relevant times, was a resident of the County of Nassau, and the State of New York, and was the Chief Executive Officer of Mian Enterprises, and direct supervisor of Defendant Helou.

8. Defendant Cynthia Leno (hereinafter "Defendant Leno"), at all relevant times, was a resident of the County of Nassau, and the State of New York, and was an assistant manager and store manager at various Long Island Checkers restaurant locations.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 and 28 U.S.C. § 1331 for civil actions arising under the law of the United States.

10. This Court has jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

11. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claim occurred in the Eastern District of New York.

## FACTS

**Background**

12. When she was sixteen years old, while still in high school, Winnie began working as a cashier at Checkers Restaurant owned by Mian Enterprises at their Westbury location in or about November 2003.

13. During all relevant periods Winnie was an employee of Mian Enterprises, and was an exemplary employee, as shown by her continual promotions from cashier, to assistant manager and ultimately to store manager. Winie only ever received one negative write up, which was a direct result of her boyfriend trying to stop the sexual harassment which she suffered daily.

14. During all relevant periods Defendant Leno was an assistant manager, and store manager at various Mian Enterprises owned Checkers locations, Defendant Helou was the general manager for Mian Enterprises owned Checkers locations in Hempstead, Westbury,

Elmont, East Meadow, Massapequa and Lake Grove, and Khursheed Haman was Chief Executive Officer and part owner of Mian Enterprises.

15. Shortly after Winnie began working at the Westbury location Defendant Helou, who was in his 30s at the time, inquired into whether she had a familial support network. Winnie informed Defendant Helou that her father was deceased and she was estranged from her mother. Further, Defendant Helou regularly inquired about any updates to Winnie's immigration status, as he was aware that Winnie was even more vulnerable while she remained undocumented, with no family in the United States.

16. Upon information and belief, Defendants Haman and Helou have both engaged in sexual relationships with undocumented women employed by Mian Enterprises.

**Incidents of Sexual Harassment**

17. In or about June 2004, shortly after Defendant Helou learned that Winnie was isolated he began asking her out by telephone and text message, and making sexual comments towards her, including but not limited to, "you have a nice ass," "your boobs are getting big," "nice rack," and "those pants make your ass look nice."

18. Winnie continually rejected Defendant Helou's advances, stating in no uncertain terms that they were unwelcome. At one point, in a desperate attempt to stop the constant phone calls, Winnie answered the phone in a deep voice, impersonating a man, and told Defendant Helou to "leave Winnie alone." This stopped the phone calls from Defendant Helou for a brief while.

19. In or about November 2006 Winnie was placed at the East Meadow location. While at the East Meadow location, Defendant Helou's comments towards Winnie increased in

frequency and his behavior escalated to touching Winnie's butt, and grazing his hands on her breasts.

20. On one occasion Defendant Helou took Winnie's phone and read text messages between herself and her boyfriend, Mr. Vargas, and commented, "you can be very sexual with him, but you never give any to me."

21. On another occasion Defendant Helou showed Winnie a photo of an underage, former Checkers employee's vagina that he had on his phone. Upon information and belief, Defendant Helou pursued this underage employee, and attempted to have a relationship and sexual relations with her.

22. In or about the summers of 2006 and 2007, Defendant Haman hosted an annual company boat ride on his personal boat for all Checkers' managers. Defendants Haman and Helou would take one or two female managers at a time along with several of the manager's female friends. Several managers asked on occasion to bring their husband or significant other and this was not permitted; they were only permitted to bring female friends.

23. In or about July 2007 Defendant Helou insisted on going on this boat ride with Winnie, who did not want to go with him. When Defendant Helou arrived at Winnie's house, Winnie's boyfriend, Mr. Vargas prevented defendant from driving Winnie. Defendant Helou and Mr. Vargas had a minor verbal confrontation, and Defendant Helou left without Winnie.

24. Subsequently, Mr. Vargas called Checkers and spoke with a manager, Defendant Leno. Using foul language and an elevated tone he told Ms. Leno that Defendant Helou needed to leave Winnie alone.

25. Following this phone call Defendant Helou suspended Winnie, immediately removing her from the schedule. Defendant Helou communicated to her that if Mr. Vargas did not come

and apologize she would be fired. Winnie had to beg Mr. Vargas to apologize, which he eventually did in a mandatory sit-down between Defendants Haman and Helou, and Winnie. After Mr. Vargas left, Defendant Haman commented to Defendant Helou that Mr. Vargas was always around, and showing up because Winnie told him everything that Defendant Helou said and did to her. After this meeting Winnie was put on the schedule for the following week. She was suspended a total of four days.

26. In or about September 2007, Winnie attended the Checkers/Rally's annual convention in Las Vegas, Nevada with Defendants Haman and Helou. Winnie was told that these conferences were mandatory. As the only female employee going to the convention, Winnie assumed she would have her own room. However, upon arrival, she was informed that she would be sharing a room with Defendant Helou. Defendant Haman would have his own room.

27. The first night, Defendant Helou made advances on Winnie, asking her to sit on the bed with him to be physically close to one another, allow him to touch her, and press his body against hers. However, Winnie was on the phone with her boyfriend, Mr. Vargas. Defendant Helou got angry that Winnie was choosing to talk to her boyfriend instead of spending time with him.

28. Defendant Helou's demeanor scared Winnie and she left the room. She went downstairs to the casino, where she stayed overnight.

29. Upon arrival back at the room the following morning, Winnie gave her boyfriend, Mr. Vargas the room number. Mr. Vargas then called the room attempting to reach Winnie. Defendant Helou answered the phone and prevented Winnie from speaking to Mr. Vargas. He then screamed at Winnie and demanded to know how Mr. Vargas got the room number. After

receiving several phone calls, Defendant Helou called down to the front desk to put a stop on the room phone.

30. Again, Defendant Helou's demeanor scared Winnie, and in an effort to not incense him further she shut her cell phone off for the remainder of the day.

31. That night after the convention, Defendant Helou insisted that Winnie come into his bed. When Winnie refused, Defendant Helou climbed into bed with Winnie pressing the front of his body tightly against her back. He wrapped his around her and proceeded to touch her breasts. Additionally, Winnie could feel Defendant Helou's erect penis pressing against her. Defendant Helou slept like this in the bed with Winnie for the remainder of the night.

32. Sunday morning, when Winnie turned her phone back on, Mr. Vargas immediately began communicating with her via the direct talk feature. Hearing Mr. Vargas attempt to contact Winnie infuriated Defendant Helou, who grabbed the cell phone out of her hands and smashed it against the wall.

33. On occasion, when Winnie was without a car, Defendant Helou would attempt to drive her home from work so that they could be alone together. Winnie felt uncomfortable getting a ride from Defendant Helou, and on one such occasion, in or about October 2007, she called her boyfriend, Mr. Vargas for a ride home. When Defendant Helou saw Mr. Vargas at the restaurant waiting to pick Winnie up he became angry and approached Mr. Vargas in his car. A verbal altercation ensued.

34. Following this confrontation Winnie was suspended, taken off of the schedule for a week, and was required to have a sit down with Defendants Haman and Helou prior to her return to work. During this meeting Defendant Helou made Winnie apologize for what had happened in order to return to work, telling her that "If you have a dog, and it shits on the floor, it's your

responsibility to clean it up." Winnie understood this to mean that she was being held accountable for the actions of Mr. Vargas. Winnie was not dismissed from the meeting until Defendants Helou and Haman's harsh words had made her cry.

35. In or about June 2008 Winnie received a text message from Defendant Helou, which read "I love you." The unsettling text message prompted Winnie to open up to a manager, Defendant Leno. Winnie showed Defendant Leno the text message and told her about some of the other things that had been going on – such as Defendant Helou often touching her inappropriately and making comments to her about her butt and breasts.

36. Subsequently, Defendant Helou called both Winnie and Defendant Leno into the office and explained that he had sent the text message to Winnie because she had worked at the company for so long and he loved her as an employee. Defendants Helou and Leno were carrying on a sexual relationship, however, Winnie did not find this out until after opening up to Defendant Leno.

37. Additionally, Defendant Helou asked Winnie if she had shown the message to Mr. Vargas. When Winnie confirmed that she did, Defendant Helou took her phone and erased the message.

38. After this incident, in or about July 2008 Winnie was transferred to the Hempstead Checkers location. The reason for Winnie's transfer was that she had told Defendant Leno about what was going on with Defendant Helou. It appeared to Winnie that whenever she attempted to reach out to someone about the abuse she was suffering, she was relocated. Winnie understood this as a message from Defendant Helou to keep her mouth shut.

39. In or about September 2008 Winnie again attended the Checkers/Rally's annual convention in Atlantic City, New Jersey. Winnie, Defendants Haman and Helou, and Defendant

Leno, who was a store manager at that time, attended the convention. Winnie was told it was mandatory for managers to attend.

40. Winnie and Defendant Leno shared a room at the convention. Defendant Leno left the room for a substantial amount of time. When Winnie was alone in the room, Defendant Helou, using a key he had procured for the female employees' room, came in and asked Winnie to have sex with him. When Winnie refused Defendant Helou got angry and stormed out of the room.

41. Shortly after the conference, in or about October 2008, Defendant Helou again began demanding that Winnie accompany him after work, as this gave him time alone with her. When Winnie refused her schedule was negatively impacted by way of reduced, late, and/or unwanted hours. When Winnie finally relented, her schedule was returned to normal. During this time alone in the car Defendant Helou would touch Winnie sexually, including feeling her breasts, forcing his hands down her pants, and forcibly kissing her.

42. Shortly thereafter Defendant Helou began to request Winnie come in at 7am when she was scheduled for 8am, and expected in at 7:45am. Winnie did not want to be alone with Defendant Helou for such an extended period of time, but fearing for her job she went in early at around 7:30 each morning.

43. On days when Winnie came in early, she was alone with Defendant Helou in the restaurant. While they were alone Defendant Helou touched Winnie sexually, including, but not limited to, putting his mouth on her breasts, forcing his hands down her pants and attempting to kiss her.

44. During normal business hours, Defendant Helou would make every attempt to get Winnie alone, for example asking her to inspect a dirty bathroom, or look for items in the stock

closet. When alone with Winnie, Defendant Helou would touch her sexually, including, but not limited to putting his mouth on her breasts, forcing his hands down her pants and/or attempting to kiss her.

45. In or about July 2010 Defendant Helou began telling Winnie that he wanted to give her the store manager position at a new Checkers location opening in Lake Grove. Shortly after he began making these promises, Defendant Helou demanded more of Winnie sexually. One morning, when they were alone, Defendant Helou exposed himself to Winnie, began rubbing himself and requested oral sex. When Winnie refused, telling Defendant Helou that she "just couldn't do it," he told her to just sit on his lap. Defendant Helou then pulled down Winnie's pants, unbuttoned her shirt and forced himself inside her.

46. From this time forward, while Winnie was working at the East Meadow Checkers location, Defendant Helou would demand sex almost daily. Defendant Helou would block off the back room with a bread rack in order to create the illusion of privacy, and intercourse between them would proceed in a similar fashion – he would often request oral sex and begin undressing Winnie when she refused, or just undress her once they were alone. Upon information and belief, the East Meadow location was most convenient for Defendant Helou to have sexual relations with Checkers staff as he was able to park his car nearby rather than in the Checkers parking lot, so that no one would know he was there.

47. In addition, Defendant Helou continued to demand that Winnie regularly accompany him after work so that they could be alone. While alone in the car, Defendant Helou would touch Winnie sexually, including feeling her breasts, forcing his hands down her pants, and forcibly kissing her.

48. At this time, Winnie opened up to another Checkers employee, Ms. Kathy Doe, regarding the harassment she was suffering. However, she did not tell this employee about Defendant Helou's constant demands for sex. Eventually, Defendant Helou discovered that Winnie had spoken to Ms. Doe. Defendant Helou demanded that Winnie delete Ms. Doe's and Defendant Leno's number from her phone, and threatened to fire her if she ever spoke to either of them again.

49. In or about May 2011, Winnie was transferred to the Lake Grove location to work beneath Ms. Leno. On one occasion Winnie had to make trips back to the Hempstead location for an inspection. Defendant Helou insisted on taking these trips together so that they could be alone. Defendant Helou would drive with Winnie from Lake Grove to Hempstead, and touch her sexually while they were in the car together.

50. In or about July 2011 Winnie requested to be moved back to the Hempstead location. Winnie was transferred back to the Hempstead location and was shortly thereafter made a store manager. About this time both the demands for sexual intercourse and the demands for Winnie to accompany Defendant Helou after work stopped, however Defendant Helou continued to forcibly touch Winnie sexually when they were alone at work, and make comments towards her about her butt and breasts.

51. In or about January 2012 Winnie found out she was pregnant. It made her extremely anxious and shameful to think of Defendant Helou touching her, and forcibly kissing her while she was pregnant, and in or about March 2012 Winnie told Defendant Helou – stating again in no uncertain terms that she could not tolerate his unwelcome, and continual sexual advances.

52. Shortly thereafter, Defendant Helou told Winnie he was "disappointed in her," was very angry and did not speak to her for several days. However, within a few days defendant

Helou again began to graze up against Winnie's breasts, force his hands down her pants, and attempt to kiss her if they were alone.

53. In or about June 2012 Winnie began to show the physical signs of pregnancy. At this time Defendant Helou's ceased making advances and demands upon Winnie. However, Defendant Helou commented that Winnie had "three bumps now."

54. Throughout Winnie's pregnancy Defendants Helou and Haman frequently made comments that she was "too young to have a baby" and that they could not "believe she was having Mr. Vargas' baby."

### Plaintiff's Complaints to Management

55. No orientation was offered at the commencement of Winnie's employment, nor was an employee handbook distributed. Winnie was only asked to sign a list of job duties, referred to as an "obligation," which did not contain any policy on sexual harassment or procedure for reporting sexual harassment

56. When Defendant Helou first began making sexual comments towards Winnie, she told Defendant Haman about the unwelcome comments. Defendant Haman did nothing.

57. Defendant Haman was aware that Winnie was not given her own room, and was made to share a room with Defendant Helou while at the conference in Las Vegas.

58. Upon return to New York from the conference in Las Vegas where Defendant Helou climbed in bed with Winnie and rubbed himself against her, she informed Defendant Haman about what happened. Again, Defendant Haman did nothing.

59. Further, Defendant Haman was present at Winnie's mandatory counseling after the incident with her boyfriend, Mr. Vargas, where Mr. Vargas called and spoke with Defendant Leno in an attempt to stop Defendant Helou's harassment of Winnie.

60. Defendant Haman was also present at the second mandatory counseling after another incident with Winnie's boyfriend, Mr. Vargas, where Mr. Vargas and Defendant Helou had a verbal altercation in an attempt by Mr. Vargas to stop Defendant Helou's harassment of Winnie.

61. Winnie was written up only one time during her nine year tenure with Checkers. This write up occurred after Mr. Vargas' confrontation with Defendant Helou, and the crux of this negative evaluation was that Winnie was bringing her personal business to work. That is to say that her attempts to reach out to others, in an effort to stop the pervasive harassment resulted in getting her written up.

62. Similarly, each time Winnie reached out to a co-worker regarding the harassment she was experiencing, she was transferred to a different Checkers location. In this way, Defendants Haman and Helou made it clear that Winnie should remain silent about the harassment.

63. Winnie also told a fellow assistant manager, who eventually became a store manager, Defendant Leno, about the harassment she was suffering, including showing her disturbing text messages received from Defendant Helou. Defendant Leno did nothing.

64. Defendant Leno was also made aware of Defendant Helou's harassing behavior towards Winnie by Mr. Vargas who called Defendant Leno in an attempt to end Defendant Helou's harassment.

**Plaintiff's Termination**

65. In or about April 2012, Winnie requested three months off in October 2012 in order to have her son. Defendant Helou explained that employees were only afforded three weeks leave to have children, and it was arranged that Winnie would take leave in October 2012. She was assured her position as a store manager upon her return.

66. On or about October 19, 2012 Winnie went on leave to have her son. At various times between April and October, Defendant Helou, Defendant Haman, and others continued to assure Winnie that her position would be available upon her return. On XX/XX/2012 Winnie's son was born.

67. On or about November 2, 2012 Winnie contacted Defendant Helou to inform him that she wanted to come back to work. Defendant Helou told her she could not return to work, that she could take four weeks leave because she had a C-section, and advised her to take more time with her baby.

68. In or about December 2012 Winnie again attempted to return to work and was informed by Defendant Haman that the Checkers locations were not yet fully functioning after the events of Super Storm Sandy and again advised Winnie to take more time with her baby.

69. In or about January 2013 Winnie again attempted to return to work and Defendant Helou told her she had to wait two weeks for Defendant Haman to return from vacation before returning from work.

70. In or about February 2013 Winnie met with Defendants Haman and Helou and office personnel and was told that she could not return to her position. Instead, Winnie would have to reapply for an available store manager position, competing against two other applicants. Upon information and belief, Winnie was competing with Ms. Leno, who had previously quit and was attempting to return to work, as well as Mr. Alberto Doe, a Checkers employee who was applying for a promotion.

71. During the reapplication process she was informed by Defendants that all managers are required to rotate night shifts, and that she would now have to work varying shifts, rather

than return to her previous schedule. This differed from before, where Winnie had a set schedule (day shifts) and would work other shifts on an as needed basis.

72. Ultimately, Defendant Leno was given the position, and Winnie was not permitted to return to work.

**Continuing Effect on Plaintiff**

73. Defendant Helou had several altercations with Winnie's boyfriend, Mr. Vargas. Because of Mr. Vargas's previous incidents with Defendant Helou, Winnie stopped telling him the things Defendant Helou did to her out of concern that his good intentions to protect her would cost her her job. This caused the altercations between Mr. Vargas and Defendant Helou to stop. However, without the presence of Mr. Vargas, Defendant Helou became more forward in his advances.

74. During the times Defendant Helou demanded Winnie accompany him after work so that they could be alone, Winnie would lie to her boyfriend about where she was, telling him she was working. She did this in order to avoid incidents like those experienced in the past.

75. In or about January 2012, Winnie found out she was pregnant. When she informed Mr. Vargas of the pregnancy he asked, "Is this my child?" Winnie was humiliated by the fact that Defendant Helou's conduct towards her made her boyfriend question their relationship in this way, and felt ashamed about all that had happened with Defendant Helou.

76. Defendants' actions have had a searing and lasting impact on Winnie. She continues to suffer in her relationship with her boyfriend and father of her child because of the shame she feels over being the subject of such harassment, and is currently in treatment to help manage and recover from the emotional and psychological scarring caused by such prolonged, devastating sexual harassment.

## FIRST CAUSE OF ACTION
### (Interference/Violation of Family Medical Leave Act)

77. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

78. At all times relevant hereto, Winnie had worked for Defendant Mian Enterprises for at least 12 months, and at least 1,250 hours during the 12 month period preceding her leave, and was therefore an employee within the meaning of 29 U.S.C. § 2611 *et seq*. The Family and Medical Leave Act of 1993.

79. At all times relevant hereto, Defendant Mian Enterprises employs at least fifty employees for each working day during each of 20 or more calendar workweeks in the current proceeding calendar year, and is therefore an employer within the meaning of 29 U.S.C. § 2611 *et seq*. The Family and Medical Leave Act of 1993.

80. Winnie was entitled to FMLA leave pursuant to 29 U.S.C. § 2612(a)(1)(A) because of the birth of her son, and arranged to take this leave six months in advance, well in accordance with the notice requirements set forth in 29 U.S.C. § 2612(e)(1).

81. Defendants' refusal to reinstate Winnie after her leave constituted interference with the exercise of her rights under the FMLA.

82. Defendants' refusal to reinstate Winnie after her leave constituted retaliation for exercising her rights under the FMLA.

83. The violation by defendants was willful and not in good faith, and Winnie is therefore entitled to liquidated damages.

84. By virtue of the foregoing, pursuant to 29 U.S.C. §§ 2615 and 2617, Winnie is entitled to recover of Mian Enterprises, Defendant Helou, and Defendant Haman, twice her lost wages with interest thereon, actual damages, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Gender Discrimination in Violation of NYSHRL)

85. Plaintiff Winnie Gittens repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

86. Winnie Gittens is a woman and protected under the meaning of the NYSHRL.

87. Defendant is an employer within the meaning of the NYSHRL.

88. During the course of her employment with defendant Mian Enterprises, Winnie was repeatedly subject to sexual harassment by Defendant Helou.

89. The sexually hostile work environment created by Defendant Helou during Winnie's employment at Checkers violated Plaintiff Winnie Gittens' rights under the NYSHRL.

90. The harassment continued after Winnie complained that Defendant Helou's sexual advances were unwelcomed and included, but was not limited to, unwanted invitations and advances, unwelcome phone calls and text messages, and unwelcomed physical contact, forcible sexual touching, and sexual intercourse.

91. Defendant, Mian Enterprises, and its principals, knew, or should have known, of Defendant Helou's offensive and illegal conduct and should have taken timely and appropriate action to remedy the harassment and prevent further incidents of harassment.

92. Defendant, Mian Enterprises, failed to take appropriate punitive or remedial action against its harassing general manager, and employee, Defendant Helou.

93. Defendant, Mian Enterprises, by its acts and omissions acquiesced to and condoned Defendant Helou's sexual harassment directed at Plaintiff, Winnie Gittens.

94. The conduct of Defendants, Mian Enterprises and Helou, substantially interfered with the employment of Winnie and created an intimidating, hostile and offensive work environment in violation of NYSHRL.

95. As a result of the sexually hostile work environment created by Defendants, Mian Enterprises, Haman, and Helou, Winnie sustained conscious pain and suffering, great mental distress, humiliation, shame and incurred monetary loss, which manifested extreme emotional distress and pain and suffering.

96. In addition, Defendant Helou linked tangible benefits of employment to compliance and/or refusal of the sexual demands he made on Winnie.

97. Similarly, Winnie's pregnancy ultimately stopped the constant unwanted sexual advances and demands of Defendant Helou, which eventually led to her termination.

98. As a direct and proximate result of Defendant's harassment in violation of NYSHRL § 296, plaintiff, Winnie Gittens has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary and compensatory damages, and other relief.

### THIRD CAUSE OF ACTION
### (Pregnancy Discrimination in Violation of NYSHRL)

99. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

100. Winnie was pregnant, on medical leave, and/or just completed permitted medical leave during the relevant time period and therefore protected under the meaning of the NYSHRL.

101. Defendant has discriminated against Winnie based on sex/pregnancy in terms, conditions, or privileges of employment, including, but not limited to, refusing to reinstate Winnie after she took maternity leave in violation of NYSHRL.

102. As a direct and proximate result of Defendants' discrimination in violation of the New York State Human Rights Law, plaintiff, Winnie Gittens, has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary and compensatory damages, and other relief.

### FOURTH CAUSE OF ACTION against Defendants Haman, Helou and Leno
### (Aiding and Abetting in Violation of NYSHRL)

103. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

104. Defendants Khursheed Haman, Gilbert Helou, and Cynthia Leno (together, the "Individual Defendants") were Plaintiff's supervisors, and knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful harassment against Plaintiff Winnie Gittens in violation of the NYSHRL by actively participating in the unlawful and discriminatory conduct set forth above.

105. As a direct and proximate result of the Individual Defendants' unlawful, and discriminatory conduct in violation of the New York State Human Rights Law, Plaintiff Winnie Gittens has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary and compensatory damages, and other relief.

## PRAYER FOR RELIEF

**WHEREFORE**, while reserving the right to seek additional damages and plead additional causes of action as available, Plaintiff demands judgment against defendants, jointly and severally, as follows:

A. Injunctive relief and a declaratory judgment in favor of Plaintiff against Defendant, declaring that Defendant has violated the FMLA, and/or the NYSHRL by discriminating against and retaliating against Plaintiff based upon her gender and pregnancy;

B. On all applicable causes of action, back pay and benefits and front pay and benefits, plus compensatory damages, in a sum not less than $6 million dollars;

C. All costs and disbursements of this action, including reasonable attorneys' fees, pursuant to 29 U.S.C. § 2617, or otherwise.

D. Any other further relief the Court may deem just and proper.

Dated:  March 18, 2014
        Carle Place, NY

_____
Joseph F. Kilada
Law Office of Joseph F. Kilada
*Attorney for the Plaitniff*
1 Old Country Road, Suite 347
Carle Place, NY 11514
516.222.0454 tel
516.908-4266 fax